v. Stephen Shane Hall. Mr. Barlow. May it please the court. Good morning. I'm Doug Barlow from Beaumont. I'm court-appointed counsel for Mr. Stephen Shane Hall. I'd like to direct my brief remarks this morning toward issue number one, and that is the issue regarding the denial of the motion to suppress a search warrant that was filed in the case and heard before the magistrate judge and referred to the district judge. We've contended in this particular issue that the search warrant was based on so many errors that it made it unconstitutionally infirm. Of course, we all know that under the Fourth Amendment, all searches are unreasonable unless they fit under certain exceptional circumstances. And this is a case where the court has to decide just what limits have to be placed on what types of mistakes and misinformation can serve as the basis of a search that would not be violative of the Fourth Amendment. I submit that under the fact situation in this case, any one of these errors that was set out in both the affidavit to support the search warrant and the warrant itself, any one of them would probably not be enough to invalidate the search. But the cumulative effect of all of these, I submit, is what makes it constitutionally infirm. I don't think we have great disagreement on the law between the briefs in this case. This court has to review the evidence that's in the light most favorable to the prevailing party, which of course in this case is the government. But we submit that the trial court simply failed to appreciate the compounding of the errors in this case. As I stated on page 20 of my brief, the reasonableness is the touchstone of the analysis of a Fourth Amendment violation. And we submit that this stretches the bounds of reasonableness. What makes it unreasonable? There's a list of things that compounded the error. The first is the information was based on hearsay that was told to the affiant, Officer Strauss, that was based on what another officer told him, based on what a confidential informant told him. Is there any evidence or argument that the hearsay was inaccurate? There is some evidence that the hearsay was inaccurate because the confidential informant was perhaps not as well informed as he should have been. There was some evidence that questions some of the conclusory statements that are in the affidavit. The location that was searched was not the location that was accurately described. Some of the misinformation that we submit, and it was disputed in the trial court, was that Mr. Hall was not the record owner of the residence despite the conclusory statement of the affiant in the affidavit. He lived there and his wife owned it. He was there temporarily. According to what I've read from the evidence, he was there temporarily. His wife was the record owner, and it was disputed whether he was in charge and control, as Officer Strauss concluded in his affidavit. More significantly, the warrant shows that it was signed at 9.45 p.m. on August 31, but the return in the inventory was sworn to on August 3, 2013. Now, the government, in its reply, has set out, well, some of these are just errors, trivial errors, mistakes, typographical errors, but I submit that when we decide what's the basis of a search and it's based on misinformation that's sworn to, well, words mean things. That's what I think this court has to decide is how far do we allow the boundaries to be stretched with misinformation and simply write it off as though this was just a trivial error. More importantly, there was evidence also that the entry was made at 9.11 p.m. on August 31, 2013, which is 34 minutes before the warrant was issued. That's another thing that I think the government would say, well, that's just a mistake. There was testimony that that was a mistake, but how many mistakes do we allow to support such a search? And so we submit that it was a compilation of errors, Officer Strauss, that led to the issuance of the warrant. As I said on page 24 of the brief, the confidential informant was misinformed because there was evidence that Mr. Hall was not permanently living at the residence, that he was separated from Misty Hall, the rightful owner of the residence, and he had only been staying there a short time while she was attending drug rehab and other persons, including a co-defendant, had been renting at the residence. But based on all that, how Officer Strauss reached his conclusory statements that are set out in the affidavit. Is there any record evidence of the term of his wife's rehab? I do not know the answer to that, Your Honor. I don't recall that from the record. Well, for him to be residing there, it doesn't have to be permanent. It has to be indefinite. And there's no reason to think that his was not at least indefinite. I agree with that under the fact situation. That's one of the factors for the court to consider. I also thought there was a surveillance camera there for several months that an officer saw him come and go and stay for periods of time. I recognize that, too. But that's just one of these factors that I've set out. And that is a conclusion that he made, and there is some evidence to support that. You're not recommending that any of this was intentional. They were sloppy errors. That's what I think it is. I think it's sloppy errors, and it's to the point of how many errors, cumulative errors, does this court want to tolerate. It has to amount to reckless disregard. It does, and it certainly appears that there's reckless disregard when you look at the cumulative effect. How about just being in a hurry? Well, I submit that all of these things, if you get in too big a hurry, becomes to the point of being reckless. The magistrate found that it was not done intentionally or with reckless disregard for the truth. That is a factual finding by the magistrate, so you must show clear error on the part of the magistrate in making that factual determination. Do you persist in saying that it is clear error by the magistrate in making those findings? That's what we submit, Your Honor, that every case is different, but these particular facts, the accumulation of these errors that led to the issuance of the search warrant, leads to the conclusion on our part that it is clear error. It's past the boundaries of what the court should tolerate, past the boundaries of reasonableness. That's the touchstone of a Fourth Amendment analysis. And as I pointed out, we don't disagree on the law, we just disagree on the application of the law to the facts. So what is the evidence to show that it was clearly erroneous, that this was not unintentional or was done with reckless disregard? Well, I don't argue that it was intentional. I just argue that this is the standard that this court should set, should not tolerate this number of errors to lead to the issuance of a warrant, and that's what demonstrates clear error in the case. As stated in the government's brief, even if there is a good faith exception to the exclusionary rule, the inquiry still continues if there's a novel question of law whose resolution is necessary to guide future action by law enforcement officers. And I submit that, just on what we've just discussed, this officer could certainly use direction, since he both caused the problems and then benefited from it by the execution of the search warrant. And as I said, the government contends that these issues are trivial, but once again, the issue is how much error is allowed to accumulate before a warrant is considered infirm, and does this court intend to allow the government to explain away erroneous facts upon which a warrant is issued without any constraints at all? Now, the timeframe on the thing was off, but you're not contending that they searched the house before the warrant was searched. If you look at the dates, it looks, the times, it appears that way, but there's no evidence to indicate that they searched the home before they got the search warrant. No evidence other than the mistakes that were set out in the recording of it, in the inventory and the dates, which those may be. We concluded, we all kind of assumed those were typos, and I think they probably are, but how much of that does this court want to tolerate? I mean, the warrant said, what, 945, and it was actually 1045. It was an hour difference. An hour is different according to the government. And what did the witnesses say about what time the police knocked on the door and came in? I think the government witnesses explained it, saying that it was a mistake, that the warrant was actually executed. Did Misty Hall or any of the occupants say what time? Did anybody on the defense side say what time? Say, no, it actually . . . I don't recall that from the evidence. So you didn't come forward with evidence to counter what the government witness said, no, I made a mistake, it was 10 and not 9. I think it's a mistake in the paperwork, is what it is. And you don't have any evidence to the contrary? I don't recall that from the record, Your Honor. No. But, as I said, I think this is just a case that the court has to decide how much error will the court tolerate in . . . before it finds . . . I forgot your argument on that. Could you talk about the guns? Well, there is an issue about that, Your Honor. I didn't prepare that for argument about the connection to the gun. That's your call. Yes, sir. But, I submit that that's set out adequately in the briefs. So, I would urge that the trial court was in error in denying the motion to suppress. I hope this court will set the standard that minimizes these kinds of effects and gives instructions to law enforcement officers. And, for the remaining issues, we believe they're adequately set out in the brief. Thank you. Thank you, Mr. Bartlett. Mr. James? May it please the Court, Counsel? As the Court is aware, A.U.S.A. Inglade was scheduled to be here today. She had a family emergency. I was second chair at that trial. I'm excited for the opportunity to stand before you and answer any questions that you may have. Mr. Hall was convicted on three counts of a second superseding indictment. Count one was conspiracy to possess with intent to distribute 50 grams or more of actual methamphetamine. Possession with intent to distribute 50 grams or more of actual methamphetamine and being a felon in possession of a firearm. Mr. Hall claims error in four respects. And, as I was preparing this for argument, I planned on discussing all four errors, being that we're only discussing issue one at the moment. I'll limit my response to that and rely on the brief, unless the Court, of course, has questions regarding the other counts. Turning to that first issue, Mr. Hall claims error in that the Court denied the motion to suppress. The standard review, as the Court noted, in the denial for motion to suppress is factual findings are reviewed for clear error and the ultimate conclusion is reviewed de novo, keeping in mind that evidence is viewed in light most favorable to the party who prevailed below, which would be the government. Now, Mr. Hall has broken up this argument into several subcategories, and I'll try to efficiently work through those. The first is that the info in the affidavit was not based on personal knowledge. Essentially what he's saying is Detective Strauss received information from Detective Wilson and based his affidavit off that. In our brief, we essentially viewed this as being a hearsay argument. The magistrate judge… He said that I know this from personal knowledge, and that was false, wasn't it? That is correct, Your Honor, and I'll move right to that point since you brought it up. The magistrate judge in his report and recommendation went through the analysis and determined, one, that Detective Strauss' affidavit wasn't a bare bones affidavit. It wasn't an affidavit in which it was just an officer saying this is based on knowledge and belief. He had worked with this confidential informant before. He had information that that confidential informant had told Sean that 72 hours was there. There was one person that was stopped with methamphetamine after leaving the house. The activity at the house was, based on his own observations, was indicative of methamphetamine traffic, and people would come for short periods of time, leave, and all of that led to him working on the warrant. Now, in his affidavit, Your Honor, you're correct. He says that I interviewed the confidential informant. The magistrate judge went back, and they looked at that very closely, and they said at the hearing he admitted that he made a mistake. He didn't interview that confidential informant. He spoke to Detective Wilson. The magistrate judge had an opportunity to assess the credibility of the officer, and they found that he unequivocally testified that it was a mere mistake. That can't be a mistake. You know if he talked to the CI or not. How is that a mistake? Well, I think if you look at the totality of the circumstances, Your Honor, it was a Labor Day weekend. He was coming back off another case. This was a joint investigation with another agency. As he's driving home, he gets a call. Hey, we've got some activity at this house. Detective Wilson conveys some information to him. He pulls over on the side of the road. He's sitting on his car trying to type up this warrant, and he made a mistake. He admitted it. The trial court found him to be credible, and they applied the good faith standard, and we'd ask that you do the same. Is he a state officer? He was, Your Honor. He's a sheriff's deputy. Do you concede there was some sloppy work done here? Absolutely, Your Honor. We concede that this wasn't the best police work that we've ever seen, but we still are of the position that it doesn't amount to a situation in which we have to overturn that decision. Moving on to the second issue, the place to be searched was listed the wrong city. Detective Strauss described this on page 586, and his explanation, if you've been to this area, actually makes sense. The area is Bridge City. It's called that because there's two bridges that essentially go into the city. There's a couple roads to the south in which you can get in, but the area in the middle is commonly referred to as people there in law enforcement is Bridge City. The house that was searched, unfortunately, was in a small portion about a street over that's in Orange County. We submit that that's an honest mistake, and as noted in the report and recommendation on page 9 and in our brief, Strauss was the affiant and executing officer. There was no possibility the premises were searched, and they cite to USV Burke, 784 F 2nd, 1090. You had the correct street address. I'm sorry? You had the correct street address. It was the correct street address, but it wasn't in Bridge City. It was in Orange. But it's not a situation. When we get to particularity issues, it's usually when they're searching apartment complexes, duplexes, cul-de-sacs, where a place could be easily confused. This is a very isolated town, and even in the suppression hearing, the closest area that they could have mistaken it for, Mr. McElroy, the defense counsel at the time, showed a picture to Detective Strauss, and that picture was in Vidor, Texas, which Detective Strauss testified had a spooner street, but it was 30 minutes away. In a small town, there's no way these officers would have mistaken a place they've been surveilling for months to be 30 minutes away. They knew the house they were going to search, and they searched that house. We contend that they relied in good faith, and it's not facially deficient for that reason. The next point of error that Mr. Hall contends is that he didn't have control of the houses listed in the affidavit. On pages 563 and 564 of the record, Strauss testified that he knew them to be married. It's a logical conclusion when people are married, no matter if they're going through marital difficulties or not, that they would live together. And on page 592, when he was asked by AUSA Anglade who did he expect to be there when the search was conducted, he said, Misty and Shane. This is further corroborated by Detective Wilson's surveillance, which the court referenced a few moments ago. On page 1197 of the record, Wilson indicates that he monitored the house for six to seven months before that time. He saw Mr. Hall coming and going as if someone would when they lived there. And on page 1205, he saw Mr. Hall working on a truck that was in the garage that same day the warrant was executed. Furthermore, at page 1225 of the record, on the day of the search, his wallet, his ID, and clothes in a dresser were his. And we know that those clothes were his because when they were escorting him out and the officers wanted to dress him properly, they asked him if he had any clothes. And he pointed to that room that he was found in with the methamphetamine and said, yes, can you get me my shirt? Is that the master bedroom or the bedroom with the backpack? It was not the master bedroom, Your Honor. It was a bedroom just across the hallway from that. Well, those things would be found in a motel room too, wouldn't they? They would be found anywhere that he spent the night. Correct, Your Honor. But that doesn't mean he necessarily lives there. No, Your Honor. That's a perfectly logical inference the other way. I agree. The truck that he was working on, it was up on blocks. It wasn't mobile. Correct, Your Honor. Now the next two issues that were referenced refer to some of the timing issues, the return in inventory that was sworn on August 13, 2013. If you look at that warrant, there's a date at the bottom under the signature that's typed in, and it does say August 13, 2013. Detective Strauss testified on page 569 of the record that the wrong day was typed in there. He said that he actually returned it on September 3rd, and this is corroborated by the clerk's stamp. When they receive this inventory, it's stamped September 4th. And then as far as the timing of when the entrance was made, it contends that the warrant was signed at 945 on August 31, 2013, and the entry was made at 9-11, the inference being that the police went there before the warrant was actually signed. And that's initially concerning. I certainly agree. However, when you look at the record at page 592, Detective Strauss testifies that what actually happened is they entered at 10-11, and he knows this because he went to dispatch. Their police procedures are they don't call over the radio in these types of situations because if they're going to do that, people who are monitoring it, it's going to put the lives of the officers in danger. So they call from a cell phone. He checked those records with dispatch and confirmed with a PCF affidavit that it was actually 10-11. What happened is when he went and he typed his report, he put 9-11. Other officers have access to this, and when these officers are executing search warrants, they're not necessarily concerned with the exact time they're going in. They're worried about their lives. So they went back and they looked at his report and put 9-11. So every subsequent report says 9-11. Officer Strauss went back and he supplemented his report. Granted, not in a timely fashion like we would like approximately four months later, but he didn't have any of the other officers do the same. So you have these reports with a conflicting time. So in conclusion with the first issue, our position is the court didn't err in finding the officers executing the warrant relied on in a good faith. Although not technically perfect, although there were some mistakes, I think you have to look at the totality of the circumstances. One other thing to keep in mind is there was testimony throughout the trial that methamphetamine is a drug which moves rather quickly. These officers have been surveilling this house for months and weren't able to pinpoint exactly what the methamphetamine they thought was there. They had two different agencies working on this. They had to draft a search warrant on the side of the road, get it to a judge's house on a holiday, gather enough people that are working at the time in a small city to execute the warrant. And I think when you consider all those factors, there's going to be some mistakes. But we submit that it doesn't invalidate the warrant or make it facially deficient. Well, I've reached the end of my remarks concerning this issue. And unless the court has further questions. I want to ask you about the firearms. What would you like to know about the firearms? He didn't have them in possession, so he had to have dominion and control. Now my recollection is that there were three firearms, one a Derringer and a backpack that didn't belong to him, and the other two in an immobilized truck in the garage. Is that fair? That's fair, Your Honor. With regards to the Derringer, there was a backpack that was found. There was testimony on page 963 of the record, which would indicate that he may have constructed possession of that backpack. That backpack was found in a bed. This room is extremely small. It was found in a bed about an arm's length from him. There was a bag on the floor on which the methamphetamine had been pulled from, which likely came from that bag. However, no one can say for sure whether that bag was open. Detective Strauss doesn't remember. Sean Wilson, who was the second person who entered the room after Strauss, he couldn't remember whether the bag was open. He remembers seeing Detective Strauss with it. I understand the court's concern in that respect, but there was evidence presented to the jury that it was possible constructive possession of that firearm. Now, as far as the three firearms in the truck, there was testimony from Detective Strauss that essentially there was a shower curtain that was thrown in there, and there's a quote that he had, and I can't find it at the moment. Oh, here it is. It's on page 1016. And he was asked, were the firearms in clear view of anybody that would walk by? And his response was, absolutely. If somebody was trying to hide them, they weren't trying very hard. They just kind of threw the curtain over there. And if you combine that with Sean Wilson's account, where he saw Defendant Hall or Mr. Hall around the truck working on it that day, there was enough evidence there for the jury to infer that he was. The evidence that the truck was his? The evidence presented at trial that it was another person that was at the truck, but there's also evidence that in a phone call made from Mr. Hall, in which he said, we need money for this truck. And the insinuation in that phone call was that he was referring to getting money from drug trafficking. So although the truck wasn't technically registered to him, he was seen with it, he made reference to it, and we feel that there was enough evidence for the jury to infer that. All right. Which firearm was he convicted of possessing? All three or four or whatever it was, or just the Derringer? I'm not entirely sure. The jury verdict for him wasn't specific as to which firearm he was convicted of. All right. But the government presented evidence to support the theory that he possessed all of them? Correct, Your Honor. Okay. How many people were in the house at the time? I believe it was six. It was either five or six, Your Honor. I'm just curious, the testimony was that they were caught rubbing the meth into the carpet as they went in. Was there any attempt to recover the meth that was rubbed into the carpet? And how do you go about doing that? Well, it's very difficult because what the testimony was, was this was a shag carpet. It was very thick. It was something you'd probably see in the 70s or an Austin Powers movie, as I recall. And the methamphetamine was deep down in there, and they're trying not to poke their hands on the methamphetamine, cut themselves, destroy the evidence. They're also trying to walk around this small room that's already crowded and has stuff all over, based on the pictures. So they have gloves, and they're down there trying to pick it up, and not the best police procedure. They see a dust buster on the wall. They grab the dust buster, they clean out the dust buster, and they start vacuuming up the methamphetamine. And there was some concerns at trial about whether that made the methamphetamine impure, and the DEA lab chemists testified pretty clearly that no, the crystals, when they're ground up, the impurities would only amount to maybe a gram. There was roughly 56 grams that were found, which wouldn't put it below the 50 grams. So Hall was one of the two men rubbing it into the shag carpet? Yes, Your Honor. Thank you. Thank you, Your Honor. Mr. Barlow? I believe the issues are all adequately before this court has submitted. I think it's just for this court to determine if this is a case that requires instruction to law enforcement, or are we going to allow all searches to be, if the court affirms it, then all searches can be conducted with this number of errors. And I believe it's clear before this court now. What was the evidence about the . . . I haven't read it in a few days. The phone call about, I need the money for a truck, I thought he was talking about getting a new truck. Or was it . . . is it plausible to say it was to fix this old truck, or was it talking about a new truck? What was it about? As I recall, I believe there's . . . I was not the trial counsel, but I believe the inference could be made that he was talking about the particular truck that was there. But I don't know that specifically. I wasn't trial counsel, Your Honor. With that, I thank the court for its time. Thank you, Mr. Barlow. I believe you're court appointed. Is that correct? Yes, Your Honor. Well, thank you very much for your service to the court. It's my understanding that the lawyers in the next case have volunteered to take on the next criminal appointment from this . . .